**FILED**

**DECEMBER 13, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**07 C 7004**

| | |
|---|---|
| RENITA WHITE, | ) |
| | ) |
| Plaintiff, | ) |
| | )    Case No. _____ |
| v. | ) |
| | ) |
| JANE ADDAMS HULL HOUSE | ) |
| ASSOCIATION, JOYCE VIGLIONE, | )    **JURY TRIAL DEMANDED** |
| and MISCHELLE CAUSEY-DRAKE, | )    **JUDGE GOTTSCHALL** |
| | )    **MAGISTRATE JUDGE VALDEZ** |
| Defendants. | ) |

**COMPLAINT FOR VIOLATION OF FMLA
AND ILLINOIS WAGE PAYMENT AND COLLECTION ACT**

NOW COMES plaintiff RENITA WHITE, by and through counsel, and states the following as her complaint against defendants JANE ADDAMS HULL HOUSE ASSOCIATION ("Hull House" or the "Association"), JOYCE VIGLIONE ("Viglione") and MISCHELLE CAUSEY-DRAKE ("Causey-Drake").

**NATURE OF THE ACTION**

1.    This action arises out of the wrongful termination of Plaintiff's employment as the Director of Hull House's Independent Living Programs, effective September 28, 2007.

2.    As detailed below, Defendants' actions in terminating Plaintiff's employment violate both the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*., and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*

3.    Defendants' wrongful conduct entitles Plaintiff to recover various damages including, but not limited to, compensatory damages and her costs of bringing this action.

## PARTIES

4.      Plaintiff is, and was at all relevant times, a resident of the City of Chicago, Cook County, Illinois.  In June 1999, Defendant Hull House hired Plaintiff as the Director of its Independent Living Programs ("ILP").  In this capacity, Plaintiff was responsible for the management and oversight of Hull House's multiple independent living facilities and the approximately one hundred (100) staff members associated with those facilities.  Plaintiff also served on Hull House's Continuous Quality Improvement Committee and was the primary facilitator for its Council on Accreditation process.  Plaintiff performed these roles until September 28, 2007, when Hull House unlawfully terminated her employment.

5.      Since 1984, Plaintiff has held various positions in the social services industry, principally in the areas of providing services to children and families, the homeless and at-risk youth.  She holds a Bachelor's Degree (Psychology) from Bradley University and a Master's Degree (Social Work) from the University of Chicago, and is a Licensed Social Worker.  Among other things, Plaintiff also: (a) serves on the Child Welfare League of America's National Advisory Task Force for Independent Living; and (b) is a reviewer for the Council on Accreditation, a nationally-recognized body that oversees the accreditation of more than 1,500 private and public organizations – including Hull House – in the United States and various international locations.  As such, Plaintiff was well-qualified to serve in her roles at Hull House, and she faithfully discharged all of her duties to the Association at all times.

6.      Defendant Hull House is an Illinois not-for-profit corporation that was organized in or about 1895.  According to its website, http://www.hullhouse.org, the Association maintains its principal offices at 1030 West Van Buren Street, Chicago, Cook County, Illinois.  Hull House's stated mission is to "improve social conditions for underserved people and communities

by providing creative, innovative programs and advocating for related public policy reforms."

7.     Upon information and belief, Defendant Viglione is a resident of Chicago, Cook County, Illinois and is presently employed as Hull House's Vice President of Child Welfare. Viglione was Plaintiff's direct supervisor throughout the duration of her employment.

8.     Upon information and belief, Defendant Causey-Drake: is a resident of Chicago, Cook County, Illinois; is presently employed as Hull House's Chief Operating Officer and General Counsel; and is Viglione's direct supervisor and second-in-command at Hull House to its President and Chief Executive Officer, Clarence N. Wood.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction to adjudicate the FMLA claims stated herein under 28 U.S.C. § 1331 because this action is brought under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*.  This Court has supplemental jurisdiction to adjudicate the state law claims stated herein under 28 U.S.C. § 1367(a) because those claims derive from a common nucleus of operative facts with Plaintiff's federal law claims.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants Hull House, Viglione and Causey-Drake each reside in Illinois, and because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

11.     On or about June 18, 1999, Hull House hired Plaintiff to be its Director of ILP at an annual salary of $58,000.

12.     Throughout her eight-year tenure at Hull House, Plaintiff's immediate supervisor was Defendant Viglione, who was responsible for, and in fact did, complete annual written reviews of Plaintiff's job performance.  Those reviews were overwhelmingly positive, in stark

-3-

contrast to the performance issues Hull House now cites in support of its termination decision.

**1999-2000 Annual Review**

13.    On or about August 23, 2000, Viglione provided Plaintiff with her written performance review for the period June 21, 1999 to June 21, 2000.  Viglione reported in the review that Plaintiff had achieved in full (100%) her goals during the period in question, and specifically lauded Plaintiff's successful efforts to:

      a.    consolidate and streamline the ILP intake process;

      b.    build relationships among her staff and otherwise encourage their professional development; and

      c.    ensure that all files complied with the maintenance directives of the Illinois Department of Child and Family Services.

14.    In the review, Viglione commended Plaintiff for "work[ing] to form positive relationships with others in the organization" and praised her "diligen[ce] in working with managerial staff to develop a shared philosophy."  Overall, Viglione concluded that Plaintiff was "thoughtful, focused, solution oriented, and well organized in her approach to issues" and had "done an outstanding job in her first year."

15.    In connection with this review, Hull House awarded Plaintiff a five percent (5%) increase in her annual salary.

**2000-2001 Annual Review**

16.    In August 2001, Viglione provided Plaintiff with her written performance review for the period June 21, 2000 to June 21, 2001.  Viglione reported that Plaintiff had again achieved in full (100%) her goals during the period in question, and praised Plaintiff's efforts to:

      a.    meet regularly with program accountants to ensure that ILP maximized its

service offerings within budgetary constraints;

b.      work with Human Resources to develop a training plan for ILP staff; and

c.      develop, in conjunction with an outside consultant, a plan to promote team-building techniques and enhance staff morale.

17.     In connection with this review, Hull House again awarded Plaintiff a five percent (5%) increase in her annual salary. Hull House also awarded Plaintiff "retroactive pay" in the amount of $5,000, in recognition for her assuming the duties of multiple positions over the previous year. In December 2001, Hull House also paid Plaintiff a special bonus of $500.00 in recognition of her superior work efforts.

**2001-2002 Annual Review**

18.     On or about June 27, 2002, Viglione provided Plaintiff with her written performance review for the period June 21, 2001 to June 21, 2002. For the third straight year, Viglione reported that Plaintiff had achieved in full (100%) her goals for the period in question. In particular, Viglione recognized Plaintiff's:

a.      willingness to assume (and successful assumption of) the additional responsibility of directly overseeing case management supervisors, in response to downsizing efforts in ILP as Hull House tried to dig itself out of an agency-wide budget crunch;

b.      design and formulation of operational policies for the ILP's Pregnant & Parenting program, the principal burden for which was shifted to Plaintiff after the sudden resignation of that program's director in November 2001;

c.      successes in securing additional funding grants for ILP, freeing up general funds for use by other programs at Hull House.

19.     Viglione concluded that, despite "numerous challenges during the past year," Plaintiff had "done an outstanding job" and was "a dedicated asset to the agency."

20.     Notwithstanding this praise and Plaintiff's successful bolstering of ILP's finances, the Association's larger monetary difficulties resulted in executive management imposing a wage freeze for all Hull House employees, including Plaintiff.

**2002-2003 Annual Review**

21.     On or about August 28, 2003, Viglione provided Plaintiff with her written performance evaluation for the period June 21, 2002 to June 21, 2003.  As before, Viglione reported that Plaintiff had achieved in full (100%) her goals during the period in question. Viglione specifically praised Plaintiff for:

> a.     securing nearly $800,000 in new grants to fund a Hull House program aimed at helping homeless youth;
>
> b.     leading ILP to a budgetary surplus of more than $100,000, in a fiscal year where Hull House's financial predicament had required it to again freeze wages and to impose five (5) unpaid furlough days on its staff; and
>
> c.     her continuing dedication to the professional development of ILP staff.

22.     Viglione went on to cite Plaintiff's "outstanding" work, noting that Plaintiff's initiatives were "held in high regard by others in the field."  Viglione also commended Plaintiff for her "key" role in the Association's positive review by the Council on Accreditation.

23.     In connection with this review, and in recognition and appreciation of the work Plaintiff had performed beyond the scope of her formal duties, Hull House awarded Plaintiff a salary increase of roughly eight percent (8%).

24.     On or about October 1, 2004, Plaintiff received an additional four percent (4%)

increase in her salary.

**2003-2004 Annual Review**

25.     On or about February 14, 2005, Viglione provided Plaintiff with her written

performance evaluation for the period June 21, 2003 to October 21, 2004.  For the fifth straight

year, Viglione reported that Plaintiff had achieved in full (100%) her goals for the period in

question.  Among other things, Viglione praised Plaintiff for:

> a.     successfully restructuring the Pregnant & Parenting program in order to
>        assure compliance with the terms of its funding contract;
>
> b.     leading an "aggressive" recruitment of new ILP clients, enabling ILP to
>        maintain and grow its budgetary surplus; and
>
> c.     mentoring Linda Washington, the director of a clinical unit within ILP, so
>        that Washington had become an "effective leader with a cohesive team."

26.     Viglione also commended Plaintiff for her efforts in developing Hull House's

new program called Emerge, which Viglione called "an invaluable service to homeless young

adults in Chicago and demonstrates growth potential."

27.     In summary, Viglione stated that:

> [Plaintiff] consistently demonstrates outstanding administrative skills and displays
> considerable talents in terms of program development and ensuring that appropriate
> systems are in place for the delivery of quality services.  She is cognizant of the
> standards and expectations of both the [Council on Accreditation] and program
> funders and makes sure that those programs under her direction are in compliance
> with the necessary mandates.  She is proactive in terms of annually reviewing and
> updating program policies and procedures, [human resources] materials, forms, etc.
> Consequently, her programs are generally well prepared for periodic reviews from
> outside auditors.

28.     On or about October 1, 2005, Plaintiff received another three percent (3%)

increase in her salary.

**2005-2006 Annual Review**

29.     On or about August 25, 2006, Viglione provided Plaintiff with her written

performance evaluation purporting to cover the period from October 2005 to October 2006.  As

she had in each prior review, Viglione reported that Plaintiff had achieved in full (100%) her

goals for the period in question.  Among other things, Viglione noted that Plaintiff had:

>           a.      renegotiated the DCFS service contract for Kelley's Home, a Transitional
>
>                   Living Program offered by Hull House, resulting in an increase of nearly
>
>                   $300,000 in budgetary income;
>
>           b.      overseen improved outcomes for youth across the ILP; and
>
>           c.      led several successful fundraising events, generating approximately
>
>                   $30,000 per year for Hull House's Emerge program.

30.     Viglione commented that Plaintiff "continues to do an outstanding job in her

position," praising her efforts in preparing two ILP programs (the "Pregnant & Parenting"

program and the "New Directions I" program) for merger into a single program "long before

[DCFS] mandated it," thereby easing the transition process and minimizing associated service

disruptions.   In conclusion, Viglione stated that "[Plaintiff] is highly organized, dependable, a

thoughtful planner, proactive manager, and has good time management skills.  Her programs and

clients are doing extremely well."

31.     On or about October 1, 2006, Plaintiff received another three percent (3%)

increase in her salary.

**Plaintiff's FMLA Leave**

32.     Plaintiff's position as the Director of ILP required her to simultaneously

administer and oversee all aspects of Hull House's multiple independent living programs,

including supervision of the roughly one hundred (100) staff deployed throughout those programs. As reflected in her annual reviews discussed above, Plaintiff also was frequently put upon to assume additional duties when Hull House, struggling to extricate itself from a budget crunch, could not or would not replace departing employees.

33.     The combined demands on Plaintiff required her to work an inordinate number of hours both during the regular workweek and on weekends, preventing her from taking any extended time off. Plaintiff brought these issues to the attention of Defendants on multiple occasions, asking that additional help be assigned both for her own well-being and that of the programs. Defendants ignored these requests.

34.     On June 22, 2007, Plaintiff visited her physician to discuss and seek treatment for recent bouts of fatigue, insomnia, lightheadedness and headaches. After examination, Plaintiff's doctor opined that work-related stresses were a significant cause of Plaintiff's medical issues and that Plaintiff should take a leave of absence from work to alleviate those stresses. Plaintiff's doctor approved her to work half-days during the week of June 25, 2007 to enable Plaintiff to arrange an orderly transition of authority, with a full-time leave of not less than two (2) weeks to begin July 2, 2007. Plaintiff's doctor also referred her to a clinical psychologist for further consultation.

35.     On June 25, 2007, Plaintiff advised Viglione of her doctor's diagnosis and instructions for leave. As her doctor instructed, Plaintiff worked half-days each day that week as she set about preparing memoranda and instructions for her staff on the procedures to be followed during her upcoming full-time absence from work.

36.     Plaintiff also advised Hull House's human resources department of her need for a leave of absence and submitted papers from her doctor in support of her request that it be

accepted as a medical leave under FMLA.  Hull House agreed to Plaintiff's request, and designated the leave as FMLA-qualified.

37.     Plaintiff began her FMLA leave from Hull House on July 2, 2007.

38.     On or about August 14, 2007, Plaintiff received medical clearance to return to work three (3) days per week, beginning August 22, 2007.  Plaintiff informed Viglione and Hull House's human resources department that she had been medically cleared to, and wished to, return to work.

39.     On or about August 20, 2007, Viglione informed Plaintiff that she should not return to work on August 22, but should instead report to Viglione's office on the morning of August 23.

**Plaintiff Placed On Administrative Leave**

40.     On August 23, 2007, and as instructed, Plaintiff reported to Viglione's office, where she found Defendants Viglione and Causey-Drake waiting for her.  Causey-Drake advised Plaintiff that, during her FMLA leave, a group of unnamed ILP staff members had reported allegations of purported improper conduct by Plaintiff.  Plaintiff denied the allegations leveled against her in their entirety, and suggested to Causey-Drake that the unidentified accusers were retaliating for past disciplinary measures Plaintiff had imposed on them.  Plaintiff urged Causey-Drake to consider the source of the allegations, and to conduct a thorough investigation of the situation before reaching a final decision.

41.     Without acknowledging Plaintiff's concerns or committing to any specific course of action, Causey-Drake informed Plaintiff that Hull House would investigate the allegations, during which time Plaintiff would be placed on paid administrative leave.  Causey-Drake promised to advise Plaintiff of the results of the investigation no later than August 31, 2007.

42.    On August 25, 2007, Plaintiff confirmed with both Viglione and Causey-Drake the substance of the August 23 meeting and her understanding that the administrative leave upon which she had been placed would be a paid one.  On August 27, 2007, Causey-Drake confirmed the accuracy of Plaintiff's understanding.

43.    In fact, Causey-Drake did not contact Plaintiff regarding the results of Hull House's investigation until September 6, 2007, nearly a week after Hull House's self-imposed deadline.  On that day, Plaintiff received messages from Causey-Drake asking Plaintiff to contact her regarding the issues giving rise to her administrative leave.

44.    On September 10, 2007, Plaintiff called Causey-Drake in follow up to these messages.  Without informing Plaintiff as to what investigation Hull House had done, Causey-Drake told Plaintiff that Hull House had concluded that Plaintiff's employment should be terminated for using "foul language" with her staff members.  Causey-Drake admitted to Plaintiff that Hull House did not know if the allegations against Plaintiff were true.

45.    Causey-Drake told Plaintiff she could either resign from her position or be fired by Hull House.  Plaintiff refused to resign and denied that Hull House had valid and legitimate grounds upon which to terminate her employment.

**Termination of Plaintiff's Employment**

46.    On September 28, 2007, Hull House (in a letter signed by Viglione) terminated Plaintiff's employment.  The stated reason for Plaintiff's termination was that she had created "an extremely uncomfortable atmosphere for the staff to complete their work" and therefore acted in a manner "not consistent with the policies and management practices that the Association condones."

47.    The allegations upon which Hull House's termination decision rests are false and,

upon information and belief, the Association's stated reason for Plaintiff's termination is a pretext for its unlawful termination of Plaintiff's employment in violation of FMLA.

## COUNT I – VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT OF 1993
### (Against Hull House)

48.    Plaintiff adopts and incorporates by reference paragraphs 1 through 47 of this Complaint as if pleaded herein.

49.    Section 101(4)(A)(i) of FMLA (29 U.S.C. § 2611(4)(A)(i)) defines an "employer" as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."  Hull House is an "employer" under this definition.

50.    FMLA requires employers to reinstate employees returning from a qualified leave of absence to either "the position of employment held by the employee when the leave commenced" or "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).  An employer's refusal to reinstate violates § 105(a)(1) of FMLA (29 U.S.C. § 2615(a)(1)).

51.    As detailed in paragraphs 34 through 37, *supra*, Plaintiff took a qualified and uncontested FMLA leave of absence from Hull House from July 2, 2007 to August 22, 2007.  As detailed in paragraph 38, *supra*, Plaintiff was medically cleared to, and expressed a desire to, return to work at Hull House effective August 22, 2007.

52.    Notwithstanding Plaintiff's medical clearance and stated desire to return to work from her FMLA leave, Hull House refused to reinstate Plaintiff to her position as Director of the ILP or place her in an "equivalent" position as that term is defined by 29 C.F.R. § 825.215.

-12-

53.    As a direct and proximate result of Defendant Hull House's refusal to reinstate Plaintiff to her position as Director of the ILP or place her in an "equivalent" position following her return from FMLA leave, Plaintiff has suffered various damages including, but not limited to, lost wages and her costs of bringing this suit.

WHEREFORE, Plaintiff respectfully asks this Court to enter an order awarding her:

a.    reinstatement to her position as Director of ILP at Hull House, complete with full service time and all other benefits as though her employment with the Association had never been terminated;

b.    back pay calculated from her September 28, 2007 dismissal date, together with pre- and post-judgment interest thereupon;

c.    reasonable costs of suit, including but not limited to her reasonable attorneys' fees and costs in prosecuting the matter; and

d.    any other relief as the Court may deem just or appropriate.

## COUNT II – VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT OF 1993
### (Against Viglione and Causey-Drake)

54.    Plaintiff adopts and incorporates by reference paragraphs 1 through 53 of this Complaint as if pleaded herein.

55.    29 C.F.R. § 825.104 provides that "Employers covered by FMLA also include any person acting, directly or indirectly, in the interest of a covered employer to any of the employees of the employer..."

56.    At all times during Plaintiff's employment, Defendants Viglione and Causey-Drake held hiring and supervisory authority over Plaintiff.  Defendant Causey-Drake, in communicating Defendant Hull House's intent to terminate Plaintiff's employment, and

Defendant Viglione, in signing the letter of termination on behalf of Defendant Hull House, further acted in the interest of a covered employer (Hull House) to its employee (Plaintiff). Thus, each of Defendants Viglione and Causey-Drake is an "employer" under the FMLA.

57.    As defined employers under FMLA, Defendants Viglione and Causey-Drake also refused to reinstate Plaintiff to her position as Director of the ILP or place her in an "equivalent" position, as detailed in paragraphs 50 to 52, *supra*.

58.    As a direct and proximate result of Defendants Viglione and Causey-Drake's refusal to reinstate Plaintiff to her position as Director of the ILP or place her in an "equivalent" position following her return from FMLA leave, Plaintiff has suffered various damages including, but not limited to, lost wages and her costs of bringing this suit.

WHEREFORE, Plaintiff respectfully asks this Court to enter an order awarding her:

a.    reinstatement to her position as Director of ILP at Hull House, complete with full service time and all other benefits as though her employment with the Association had never been terminated;

b.    back pay calculated from her September 28, 2007 dismissal date, together with pre- and post-judgment interest thereupon;

c.    reasonable costs of suit, including but not limited to her reasonable attorneys' fees and costs in prosecuting the matter; and

d.    any other relief as the Court may deem just or appropriate.

## COUNT III – VIOLATION OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT
### (Against Hull House)

59.    Plaintiff adopts and incorporates by reference paragraphs 1 through 58 of this Complaint as if pleaded herein.

-14-

60.     Section 5 of IWPCA (820 ILCS 115/5) provides that, "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee."

61.     Section 2 of IWPCA (820 ILCS 115/2) defines "final compensation" as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties."

62.     As a regular employee of Hull House, Plaintiff was paid bi-weekly and on the basis of a thirty-five (35) hour workweek.  Thus, every two weeks, Plaintiff was paid for seventy (70) hours of work, less mandatory and elective withholdings and deductions.

63.     As a regular employee of Hull House, Plaintiff also was entitled to accrue 2.91 days (or 20.37 hours) of paid time off ("PTO") per each month of full-time service, for a total of 35 days (or 245 hours) of PTO per year employed (the "PTO bank").  Hull House rules state that if an employee does not use his or her full balance of PTO days in a given employment year, he or she may carry over up to ten (10) PTO days (*i.e.*, 70 PTO hours) to the subsequent employment year.  Hull House rules also state that unused PTO in excess of this amount will be credited to an FMLA/Disability time account that the employee may use to receive his or her regular pay during an otherwise qualified, but unpaid, FMLA leave (the "FMLA bank").

64.     As of July 2, 2007, when Plaintiff began her approved FMLA leave, Plaintiff had a PTO bank of 147.07 hours and an FMLA bank of 432.38 hours.

65.     On July 13, 2007, during her approved FMLA leave, Plaintiff was paid $1,980.54 by Hull House, representing her regular bi-weekly salary after certain deductions.  Instead of funding this amount with time from Plaintiff's FMLA bank, Hull House funded it using sixty-

-15-

three (63) hours drawn from Plaintiff's PTO bank and seven (7) hours of holiday time (for Independence Day).

66.    On July 27, 2007, during her approved FMLA leave, Plaintiff was paid $1,977.12 by Hull House, representing her regular bi-weekly salary after certain deductions.  Instead of funding this amount with time from Plaintiff's FMLA bank, Hull House funded it with seventy (70) hours drawn from Plaintiff's PTO bank.

67.    On August 10, 2007, during her approved FMLA leave, Plaintiff was paid $1,980.35 by Hull House, representing her regular bi-weekly salary less certain deductions.  According to Hull House, instead of funding this amount with time from Plaintiff's FMLA bank, the Association funded it with 24.85 hours drawn from Plaintiff's PTO bank and 45.15 hours drawn from Plaintiff's FMLA bank.

68.    On August 24, 2007, the day after Plaintiff was to return from her approved FMLA leave, Plaintiff was paid $1,976.95 by Hull House, representing her regular bi-weekly salary less certain deductions.  According to Hull House, this amount was funded with fifty-six (56) hours drawn from Plaintiff's FMLA bank, seven (7) hours of regular pay (in recognition of her attendance at the August 23 meeting) and seven (7) hours of paid administrative leave.  The pay stub provided to Plaintiff in connection with this payment, however, indicates that the amount was funded with fifty-six (56) hours drawn from Plaintiff's FMLA bank and fourteen (14) hours drawn from Plaintiff's PTO bank.

69.    On September 7, 2007, Plaintiff was paid $1,980.35 by Hull House, representing her regular bi-weekly salary less certain deductions.  Hull House funded this amount with seventy (70) hours of paid administrative leave, as per the arrangement promised by Defendant Causey-Drake.

-16-

70.     On September 21, 2007, Plaintiff was paid $1,976.93 by Hull House, representing her regular bi-weekly salary less certain deductions. Instead of funding this amount with seventy (70) hours of paid administrative leave, as per the arrangement promised by Defendant Causey-Drake, Hull House funded it with 45.15 hours drawn from Plaintiff's FMLA bank, 5.39 hours drawn from Plaintiff's PTO bank, and 19.46 hours drawn from an unspecified source.

71.     On October 5, 2007, Plaintiff was paid $1,127.02 by Hull House, representing one week's pay (for the period between September 21 and her termination date of September 28) less certain deductions. Hull House funded this amount with thirty-five (35) hours of paid administrative leave, as per the arrangement promised by Defendant Causey-Drake. As of September 28, Plaintiff had an earned, but unused, balance of at least 331.23 hours in her FMLA bank.

72.     Hull House has refused to pay Plaintiff the monetary equivalent of her FMLA bank within the time frame specified by 820 ILCS 115/5, despite her express request for that payment. Hull House's disclaimer of any obligation to pay the monetary equivalent of those hours to Plaintiff is particularly egregious considering that: (a) as detailed in paragraphs 65 to 67, *supra*, it funded Plaintiff's paid FMLA leave by drawing first from her PTO bank, rather than from the dedicated FMLA bank; and (b) the Association funded, at least in part, Plaintiff's forced administrative leave with time drawn from her PTO and FMLA banks. The foregoing conduct constitutes wilful violations of the IWCPA (820 ILCS 115/14).

73.     As a direct and proximate result of Hull House's: (a) misuse of Plaintiff's earned PTO time to fund her FMLA and paid administrative leaves; and (b) refusal to pay Plaintiff the monetary equivalent of her accrued, but unused, FMLA bank following her termination; Plaintiff has suffered various damages including, but not limited to, the amounts unpaid and her costs of

-17-

bringing this suit.

WHEREFORE, Plaintiff respectfully asks this Court to enter an order:

a.      directing Hull House to provide an accounting for all activity taken with respect to Plaintiff's PTO and FMLA banks from July 1, 2007 to September 28, 2007;

b.      awarding her monetary damages representing the value of any PTO and FMLA bank time wrongfully used or withheld by Hull House, together with pre- and post-judgment interest thereupon;

c.      awarding her reasonable costs of suit, including but not limited to her reasonable attorneys' fees and costs in prosecuting the matter; and

d.      awarding any other relief as the Court may deem just or appropriate.

## COUNT IV – VIOLATION OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT
### (Against Viglione and Causey-Drake)

74.     Plaintiff adopts and incorporates by reference paragraphs 1 through 73 of this Complaint as if pleaded herein.

75.     Section 2 of the IWPCA (820 ILCS 115/2) provides that the term "employer" includes "any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee..."  Section 13 of the IWPCA (820 ILCS 115/13) further provides that "Any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation."

76.     At all times during Plaintiff's employment, Defendants Viglione and Causey-Drake held hiring and supervisory authority over Plaintiff, including with respect to her pay. Defendants Causey-Drake and Viglione, in communicating the terms of Plaintiff's

-18-

"administrative leave," further acted in the interest of a covered employer (Hull House) to an employee of that employer (Plaintiff). Thus, each of Defendants Viglione and Causey-Drake is an "employer" under the IWPCA.

77.　　As defined employers under the IWPCA, Defendants Viglione and Causey-Drake failed to pay Plaintiff the amounts owed her under the IWPCA, as detailed in paragraphs 65 to 72, *supra*. That conduct constitutes wilful violations of the IWCPA (820 ILCS 115/14).

78.　　As a direct and proximate result of Defendants Viglione and Causey-Drake's failures to ensure that: (a) Plaintiff's FMLA and administrative leaves were funded appropriately and; (b) Plaintiff received the amounts owed her under the IWPCA within the time frame specified by the statute, Plaintiff has suffered various damages including, but not limited to, the amounts unpaid and her costs of bringing this suit.

WHEREFORE, Plaintiff respectfully asks this Court to enter an order:

a.　　directing Defendants Viglione and Causey-Drake to provide an accounting for all activity taken with respect to Plaintiff's PTO and FMLA banks from July 1, 2007 to September 28, 2007;

b.　　awarding her monetary damages representing the value of any PTO and FMLA bank time wrongfully used or withheld by Hull House, together with pre- and post-judgment interest thereupon;

c.　　awarding her reasonable costs of suit, including but not limited to her reasonable attorneys' fees and costs in prosecuting the matter; and

d.　　awarding any other relief as the Court may deem just or appropriate.

## **JURY DEMAND**

Plaintiff respectfully demands trial by jury for all issues so triable as identified herein,

pursuant to Federal Rule of Civil Procedure 38(b)(2).


Date: December 13, 2007                    Respectfully submitted,

                                           RENITA WHITE


                                           ____/s/ Eric J. Marler____
                                           By: One of Her Attorneys

Eric J. Marler
Scott G. Golinkin
Keith W. Mandell
REARDON GOLINKIN & REED
111 West Washington Street, Suite 707
Chicago, Illinois  60602
312/855-3700
Attorney No. 36235