**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RENITA WHITE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | 07 C 7004 |
| | ) | |
| **JANE ADDAMS HULL HOUSE** | ) | **JUDGE GOTTSCHALL** |
| **ASSOCIATION, JOYCE VIGLIONE, and** | ) | **MAGISTRATE JUDGE VALDEZ** |
| **MISCHELLE CAUSEY-DRAKE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT**

Defendant, JANE ADDAMS HULL HOUSE ASSOCIATION, JOYCE VIGLIONE and

MISCHELLE CAUSEY-DRAKE, by and through their attorneys, Laner Muchin Dombrow

Becker Levin and Tominberg, Ltd., hereby submit their Answer and Affirmative Defenses to

Plaintiff's Complaint as follows:

**NATURE OF THE ACTION**

1.     This action arises out of the wrongful termination of Plaintiff's employment as the
Director of Hull House's Independent Living Programs, effective September 28, 2007.

**ANSWER:**

Defendants admit that this action arises from Plaintiff's termination as Director of Hull

House's Independent Living Programs, effective on or about September 28, 2007, but deny that

the Defendants engaged in any unlawful conduct for which liability can be imposed.

2.     As detailed below, Defendants' actions in terminating Plaintiff's employment
violate both the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*,
and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*

**ANSWER:**

Defendants deny the allegations contained in Paragraph No. 2.

3.      Defendants' wrongful conduct entitles Plaintiff to recover various damages including, but not limited to, compensatory damages and her costs of bringing this action.

**ANSWER:**

Defendants deny the allegations contained in Paragraph No. 3.

## PARTIES

4.      Plaintiff is, and was at all relevant times, a resident of the City of Chicago, Cook County, Illinois.  In June 1999, Defendant Hull House hired Plaintiff as the Director of its Independent Living Programs ("ILP").  In this capacity, Plaintiff was responsible for the management and oversight of Hull House's multiple independent living facilities and the approximately one hundred (100) staff members associated with those facilities.  Plaintiff also served on Hull House's Continuous Quality Improvement Committee and was the primary facilitator for its Council on Accreditation process.  Plaintiff performed these roles until September 28, 2007, when Hull House unlawfully terminated her employment.

**ANSWER:**

Defendants deny that Plaintiff was unlawfully terminated from her employment.

Defendants deny that Plaintiff "was the primary facilitator for its Council on Accreditation

process."  Defendants admit the remaining allegations contained in Paragraph No. 4.

5.      Since 1984, Plaintiff has held various positions in the social services industry, principally in the areas of providing services to children and families, the homeless and at-risk youth.  She holds a Bachelor's Degree (Psychology) from Bradley University and a Master's Degree (Social Work) from the University of Chicago, and is a Licensed Social Worker.  Among other things, Plaintiff also: (a) serves on the Child Welfare League of America's National Advisory Task Force for Independent Living; and (b) is a reviewer for the Council on Accreditation, a nationally-recognized body that oversees the accreditation of more than 1,500 private and public organizations – including Hull House – in the United States and various international locations.  As such, Plaintiff was well-qualified to serve in her roles at Hull House, and she faithfully discharged all of her duties to the Association at all times.

**ANSWER:**

Defendants deny that Plaintiffs "faithfully discharged all of her duties to the Association

at all times."  Defendants admit the remaining allegations contained in Paragraph No. 5.

6.      Defendant Hull House is an Illinois not-for-profit corporation that was organized in or about 1895.  According to its website, http://www.hullhouse.org, the Association maintains its principal offices at 1030 West Van Buren Street, Chicago, Cook County, Illinois.  Hull House's stated mission is to "improve social conditions for underserved people and communities by providing creative, innovative programs and advocating for related public policy reforms."

**ANSWER:**

Defendants admit that Hull House was organized in or around 1899. Defendants admit the remaining allegations contained in Paragraph No. 6.

7.    Upon information and belief, Defendant Viglione is a resident of Chicago, Cook County, Illinois and is presently employed as Hull House's Vice President of Child Welfare. Viglione was Plaintiff's direct supervisor throughout the duration of her employment.

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 7.

8.    Upon information and belief, Defendant Causey-Drake: is a resident of Chicago, Cook County, Illinois; is presently employed as Hull House's Chief Operating Officer and General Counsel; and is Viglione's direct supervisor and second-in-command at Hull House to its President and Chief Executive Officer, Clarence N. Wood.

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 8.

## JURISDICTION AND VENUE

9.    This Court has original jurisdiction to adjudicate the FMLA claims stated herein under 28 U.S.C. § 1331 because this action is brought under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* This Court has supplemental jurisdiction to adjudicate the state law claims stated herein under 28 U.S.C. § 1367(a) because those claims derive from a common nucleus of operative facts with Plaintiff's federal law claims.

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 9.

10.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants Hull House, Viglione and Causey-Drake each reside in Illinois, and because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 10.

## FACTUAL BACKGROUND

11.    On or about June 18, 1999, Hull House hired Plaintiff to be its Director of ILP at an annual salary of $58,000.

3

**ANSWER:**

Defendants admit that on or about June 21, 1999 Hull House hired Plaintiff to be its Director of ILP at an annual salary of $58,000.

12.     Throughout her eight-year tenure at Hull House, Plaintiff's immediate supervisor was Defendant Viglione, who was responsible for, and in fact did, complete annual written reviews of Plaintiff's job performance.  Those reviews were overwhelmingly positive, in stark contrast to the performance issues Hull House now cites in support of its termination decision.

**ANSWER:**

Defendants deny that "[t]hose reviews were overwhelmingly positive, in stark contrast to the performance issues Hull House now cites in support of its termination decision."  Defendants admit that Viglione gave Plaintiff positive criticisms and identified areas for Plaintiff to improve her performance.  Defendants deny the remaining allegations contained in Paragraph No. 12.

**1999-2000 Annual Review**

13.     On or about August 23, 2000, Viglione provided Plaintiff with her written performance review for the period June 21, 1999 to June 21, 2000.  Viglione reported in the review that Plaintiff had achieved in full (100%) her goals during the period in question, and specifically lauded Plaintiff's successful efforts to:

      a.     consolidate and streamline the ILP intake process;

      b.     build relationships among her staff and otherwise encourage their professional development; and

      c.     ensure that all files complied with the maintenance directives of the Illinois Department of Child and Family Services.

**ANSWER:**

Defendants admit that on or around August 23, 2000, Viglione gave Plaintiff an annual performance evaluation.  Defendants admit that Viglione gave Plaintiff positive criticisms in that evaluation.  Defendants deny that "Plaintiff had achieved in full (100%) her goals during the period in question."  Defendants deny that Viglione "specifically lauded Plaintiff's successful efforts."  Defendants admit the remaining allegations contained in Paragraph No. 13.

4

14.     In the review, Viglione commended Plaintiff for "work[ing] to form positive relationships with others in the organization" and praised her "diligen[ce] in working with managerial staff to develop a shared philosophy."  Overall, Viglione concluded that Plaintiff was "thoughtful, focused, solution oriented, and well organized in her approach to issues" and had "done an outstanding job in her first year."

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 14.

15.     In connection with this review, Hull House awarded Plaintiff a five percent (5%) increase in her annual salary.

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 15.

**2000-2001 Annual Review**

16.     In August 2001, Viglione provided Plaintiff with her written performance review for the period June 21, 2000 to June 21, 2001.  Viglione reported that Plaintiff had again achieved in full (100%) her goals during the period in question, and praised Plaintiff's efforts to:

   a.     meet regularly with program accountants to ensure that ILP maximized its service offerings within budgetary constraints;

   b.     work with Human Resources to develop a training plain for ILP staff; and

   c.     develop, in conjunction with an outside consultant, a plan to promote team-building techniques and enhance staff morale.

**ANSWER:**

Defendants admit that in or around August 2001, Plaintiff was given her annual performance evaluation.  Defendants deny that "Viglione reported that Plaintiff had again achieved in full (100%) her goals during the period in question."  Defendants admit that the performance review was positive, and that Plaintiff received positive criticism in the areas mentioned in Paragraph No. 16.  Defendants deny all remaining allegations contained in Paragraph No. 16.

17.     In connection with this review, Hull House again awarded Plaintiff a five percent (5%) increase in her annual salary.  Hull House also awarded Plaintiff "retroactive pay" in the

amount of $5,000, in recognition for her assuming the duties of multiple positions over the previous year.  In December 2001, Hull House also paid Plaintiff a special bonus of $500.00 in recognition of her superior work efforts.

**ANSWER:**

Defendants admit that Plaintiff received a 5% salary increase.  Defendants deny that Plaintiff received $5,000 in retroactive pay.  Defendants admit that Plaintiff received a one-time bonus in the amount of $500 to compensate Plaintiff for assuming increased supervisory duties.

**2001-2002 Annual Review**

18.    On or about June 27, 2002, Viglione provided Plaintiff with her written performance review for the period June 21, 2001 to June 21, 2002.  For the third straight year, Viglione reported that Plaintiff had achieved in full (100%) her goals for the period in question. In particular, Viglione recognized Plaintiff's:

> a.    willingness to assume (and successful assumption of) the additional responsibility of directly overseeing case management supervisors, in response to downsizing efforts in ILP as Hull House tried to dig itself out of an agency-wide budget crunch;
>
> b.    design and formulation of operational policies for the ILP's Pregnant & Parenting program, the principal burden for which was shifted to Plaintiff after the sudden resignation of that program's director in November 2001;
>
> c.    successes in securing additional funding grants for ILP, freeing up general funds for use by other programs at Hull House.

**ANSWER:**

Defendants admit that on or about June 27, 2002 Plaintiff was given her annual performance evaluation.  Defendants further admit that the performance review was positive, but denies that Viglione "reported that Plaintiff had achieved in full (100%) her goals for the period in question."  Defendants admit that Plaintiff received positive criticism in the areas of critique mentioned in Paragraph No. 18.  Defendants deny all remaining allegations contained in Paragraph No. 18.

19.     Viglione concluded that, despite "numerous challenges during the past year," Plaintiff had "done an outstanding job" and was "a dedicated asset to the agency."

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 19.

20.     Notwithstanding this praise and Plaintiff's successful bolstering of ILP's finances, the Association's larger monetary difficulties resulted in executive management imposing a wage freeze for all Hull House employees, including Plaintiff.

**ANSWER:**

Defendants deny that Plaintiff was "praised."  Defendants admit that "the Association's later monetary difficulties resulted in executive management imposing a wage freeze for all Hull House employees, including Plaintiff."  Defendants admit that Plaintiff played a role in the collective effort of increasing ILP's finances.  Defendants deny the remaining allegations contained in Paragraph No. 20.

**2002-2003 Annual Review**

21.     On or about August 28, 2003, Viglione provided Plaintiff with her written performance evaluation for the period June 21, 2002 to June 21, 2003.  As before, Viglione reported that Plaintiff had achieved in full (100%) her goals during the period in question. Viglione specifically praised Plaintiff for:

    a.     securing nearly $800,000 in new grants to fund a Hull House program aimed at helping homeless youth;

    b.     leading ILP to a budgetary surplus of more than $100,000, in a fiscal year where Hull House's financial predicament had required it to again freeze wages and to impose five (5) unpaid furlough days on its staff; and

    c.     her continuing dedication to the professional development of ILP staff.

**ANSWER:**

Defendants admit that in or around August 2003, Plaintiff was given her annual performance evaluation.  Defendants deny that Viglione "reported that Plaintiff had achieved in full (100%) her goals during the period in question."  Defendants deny that Viglione "praised"

Plaintiff, but admit that Plaintiff's performance review was positive, and that Plaintiff received positive criticism in the areas of critique mentioned in Paragraph No. 21.  Defendants deny all remaining allegations contained in Paragraph No. 21.

22.    Viglione went on to cite Plaintiff's "outstanding" work, noting that Plaintiff's initiatives were "held in high regard by others in the field."  Viglione also commended Plaintiff for her "key" role in the Association's positive review by the Council on Accreditation.

**ANSWER:**

Defendants admit that Plaintiff received positive criticism performance.  Defendants deny that Viglione commended Plaintiff for her "'key' role in the Association's positive review by the Council on Accreditation."  Defendants deny the remaining allegations contained in Paragraph No. 22.

23.    In connection with this review, and in recognition and appreciation of the work Plaintiff had performed beyond the scope of her formal duties, Hull House awarded Plaintiff a salary increase of roughly eight percent (8%).

**ANSWER:**

Defendants deny that "[i]n connection with this review, and in recognition and appreciation of the work Plaintiff had performed beyond the scope of her formal duties, Hull House awarded Plaintiff a salary increase of roughly eight percent (8%)."  Defendants admit that Plaintiff received no salary increase in connection with this evaluation due to a salary freeze, as reflected in Plaintiff's performance evaluation.  Defendants, further answering, state that on October 24, 2003 Viglione requested a salary adjustment for Plaintiff in the amount of $3,000 because Plaintiff had "recently assumed responsibilities" in addition to her current job functions. Defendants deny the remaining allegations contained in Paragraph No. 23.

24.    On or about October 1, 2004, Plaintiff received an additional four percent (4%) increase in her salary.

**ANSWER:**

Defendants admit that Plaintiff received a 4% salary increase on or about October 1, 2004.

**2003-2004 Annual Review**

25.    On or about February 14, 2005, Viglione provided Plaintiff with her written performance evaluation for the period June 21, 2003 to October 21, 2004.  For the fifth straight year, Viglione reported that Plaintiff had achieved in full (100%) her goals for the period in question.  Among other things, Viglione praised Plaintiff for:

    a.    successfully restructuring the Pregnant & Parenting program in order to assure compliance with the terms of its funding contract;

    b.    leading an "aggressive" recruitment of new ILP clients, enabling ILP to maintain and grow its budgetary surplus; and

    c.    mentoring Linda Washington, the director of a clinical unit within ILP, so that Washington had become an "effective leader with a cohesive team."

**ANSWER:**

Defendants deny that "for the fifth straight year, Viglione reported that Plaintiff had achieved in full (100%) her goals for the period in question."  Defendants admit that on or about February 14, 2004, Viglione gave Plaintiff her annual performance evaluation.  Defendants admit that Plaintiff received positive criticisms in the areas of critique identified in Paragraph No. 25.

26.    Viglione also commended Plaintiff for her efforts in developing Hull House's new program called Emerge, which Viglione called "an invaluable service to homeless young adults in Chicago and demonstrates growth potential."

**ANSWER:**

Defendants admit that Viglione gave Plaintiff positive criticism for her role in the collective effort of developing the Emerge program, but deny that Viglione "commended" Plaintiff.  Defendants admit that Viglione called Emerge "an invaluable service to homeless young adults in Chicago and demonstrates growth potential" by Hull House.

9

27.    In summary, Viglione stated that:

> [Plaintiff] consistently demonstrates outstanding administrative skills and displays considerable talents in terms of program development and ensuring that appropriate systems are in place for the delivery of quality services.  She is cognizant of the standards and expectations of both the [Council on Accreditation] and program funders and makes sure that those programs under her direction are in compliance with the necessary mandates.  She is proactive in terms of annually reviewing and updating program policies and procedures, [human resources] materials, forms, etc.  Consequently, her programs are generally well prepared for periodic reviews from outside auditors.

**<u>ANSWER:</u>**

Defendants admit that Viglione made the statement contained Paragraph No. 27, but deny that it fully summarizes Plaintiff's entire performance evaluation.

28.    On or about October 1, 2005, Plaintiff received another three percent (3%) increase in her salary.

**<u>ANSWER:</u>**

Defendants admit the allegations contained in Paragraph No. 28.

**<u>2005-2006 Annual Review</u>**

29.    On or about August 25, 2006, Viglione provided Plaintiff with her written performance evaluation purporting to cover the period from October 2005 to October 2006.  As she had in each prior review, Viglione reported that Plaintiff had achieved in full (100%) her goals for the period in question.  Among other things, Viglione noted that Plaintiff had:

a.    renegotiated the DCFS service contract for Kelley's Home, a Transitional Living Program offered by Hull House, resulting in an increase of nearly $300,000 in budgetary income;

b.    overseen improved outcomes for youth across the ILP; and

c.    led several successful fundraising events, generating approximately $30,000 per year for Hull House's Emerge program.

**<u>ANSWER:</u>**

Defendants deny that Viglione "reported that Plaintiff had achieved in full (100%) her goals for the period in question."  Defendants admit that Viglione gave Plaintiff a performance

evaluation for the time period of October 2005 to October 2006.  Defendants admit that Plaintiff

received positive criticisms of her job performance.  Defendants admit that Viglione gave

Plaintiff positive criticism for her role in a collective effort to: improve the outcome of youths in

the ILP; raise funds for Emerge; and renegotiate the DCFS contract for Kelley's Home.

30.    Viglione commented that Plaintiff "continues to do an outstanding job in her
position," praising her efforts in preparing two ILP programs (the "Pregnant & Parenting"
program and the "New Directions I" program) for merger into a single program "long before
[DCFS] mandated it," thereby easing the transition process and minimizing associated service
disruptions.  In conclusion, Viglione stated that "[Plaintiff] is highly organized, dependable, a
thoughtful planner, proactive manager, and has good time management skills.  Her programs and
clients are doing extremely well."

**ANSWER:**

Defendants admit that Viglione stated that Plaintiff "continues to do an outstanding job in

her position as administrator of the independent/transitional living programs as well as Emerge."

Defendants deny that Viglione "prais[ed] Plaintiff's efforts in preparing two ILP programs (the

'Pregnant & Parenting' program and the 'New Directions I' program)."  Defendants admit that

Viglione gave Plaintiff positive criticism for her skills in organization, planning and time

management.  Defendants admit that, at the time in question, Viglione stated "her programs and

clients are doing extremely well."  Defendants deny the remaining allegations contained in

Paragraph No. 30.

31.    On or about October 1, 2006, Plaintiff received another three percent (3%)
increase in her salary.

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 31.

**Plaintiff's FMLA Leave**

32.    Plaintiff's position as the Director of ILP required her to simultaneously administer and oversee all aspects of Hull House's multiple independent living programs, including supervision of the roughly one hundred (100) staff deployed throughout those programs.  As reflected in her annual reviews discussed above, Plaintiff also was frequently put upon to assume additional duties when Hull House, struggling to extricate itself from a budget crunch, could not or would not replace departing employees.

**ANSWER:**

Defendants admit that as Director of ILP, Plaintiff was expected to administer Hull House's independent living programs.   Defendants admit that with the assistance of approximately 7 to 8 subordinate supervisors, Plaintiff supervised a staff of approximately 60 employees, in or around 2007.   Defendants deny that Plaintiff was "put upon to assume additional duties," but admits that budgetary constraints prevented Hull House -- a non-for-profit social service agency that services at-risk youths in the Chicagoland area -- from filling vacant staff positions.

33.    The combined demands on Plaintiff required her to work an inordinate number of hours both during the regular workweek and on weekends, preventing her from taking any extended time off.  Plaintiff brought these issues to the attention of Defendants on multiple occasions, asking that additional help be assigned both for her own well-being and that of the programs.  Defendants ignored these requests.

**ANSWER:**

Defendants deny the allegations contained in Paragraph No. 33.

34.    On June 22, 2007, Plaintiff visited her physician to discuss and seek treatment for recent bouts of fatigue, insomnia, lightheadedness and headaches.  After examination, Plaintiff's doctor opined that work-related stresses were a significant cause of Plaintiff's medical issues and that Plaintiff should take a leave of absence from work to alleviate those stresses.  Plaintiff's doctor approved her to work half-days during the week of June 25, 2007 to enable Plaintiff to arrange an orderly transition of authority, with a full-time leave of not less than two (2) weeks to begin July 2, 2007.  Plaintiff's doctor also referred her to a clinical psychologist for further consultation.

**ANSWER:**

Defendants admit that Plaintiff's doctor approved Plaintiff to work half-days during the week of June 25, 2007.  Defendants deny that anything contained in Plaintiff's doctor's approval for time off suggested that any of his recommendations were made so that "Plaintiff could arrange an orderly transition of authority."  Defendants admit that Plaintiff's physician also recommended that Plaintiff take two (2) weeks of full-time leave beginning on or about July 2, 2007.  Defendants deny the remaining allegations contained in Paragraph No. 34.

35.    On June 25, 2007, Plaintiff advised Viglione of her doctor's diagnosis and instructions for leave.  As her doctor instructed, Plaintiff worked half-days each day that week as she set about preparing memoranda and instructions for her staff on the procedures to be followed during the upcoming full-time absence from work.

**ANSWER:**

Defendants admit that on or about June 25, 2007, Plaintiff informed Viglione of Plaintiff's physician's instructions.  Defendants admit that Plaintiff began to work half-days that week.

36.    Plaintiff also advised Hull House's human resources department of her need for a leave of absence and submitted papers from her doctor in support of her request that it be accepted as a medical leave under FMLA.  Hull House agreed to Plaintiff's request, and designated the leave as FMLA-qualified.

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 36.

37.    Plaintiff began her FMLA leave from Hull House on July 2, 2007.

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 37.

38.    On or about August 14, 2007, Plaintiff received medical clearance to return to work three (3) days per week, beginning August 22, 2007.  Plaintiff informed Viglione and Hull House's human resources department that she had been medically cleared to, and wished to, return to work.

13

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 38.

39.    On or about August 20, 2007, Viglione informed Plaintiff that she should not return to work on August 22, but should instead report to Viglione's office on the morning of August 23.

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 39.

**Plaintiff Placed On Administrative Leave**

40.    On August 23, 2007, and as instructed, Plaintiff reported to Viglione's office, where she found Defendants Viglione and Causey-Drake waiting for her. Causey-Drake advised Plaintiff that, during her FMLA leave, a group of unnamed ILP staff members had reported allegations of purported improper conduct by Plaintiff. Plaintiff denied the allegations leveled against her in their entirety, and suggested to Causey-Drake that the unidentified accusers were retaliating for past disciplinary measures Plaintiff had imposed on them. Plaintiff urged Causey-Drake to consider the source of the allegations, and to conduct a thorough investigation of the situation before reaching a final decision.

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 40.

41.    Without acknowledging Plaintiff's concerns or committing to any specific course of action, Causey-Drake informed plaintiff that Hull House would investigate the allegations, during which time Plaintiff would be placed on paid administrative leave. Causey-Drake promised to advise Plaintiff of the results of the investigation no later than August 31, 2007.

**ANSWER:**

Defendants deny the allegation "without acknowledging Plaintiff's concerns or committing to any specific course of action." Defendants admit that Causey-Drake committed to the course of action that Hull House would investigate the allegations made concerning Plaintiff while Plaintiff was placed on paid administrative leave. Defendants deny that Plaintiff was "promised" by Causey-Drake that the result of the investigation would be provided to Plaintiff by August 31, 2007.

42.    On August 25, 2007, Plaintiff confirmed with both Viglione and Causey-Drake the substance of the August 23 meeting and her understanding that the administrative leave upon

which she had been placed would be a paid one.  On August 27, 2007, Causey-Drake confirmed the accuracy of Plaintiff's understanding.

**ANSWER:**

Defendants admit that on or about August 25, 2007, Viglione and Causey-Drake spoke with Plaintiff and confirmed that Plaintiff was being placed on paid administrative leave pending the investigation.  Defendants admit that Causey-Drake informed Plaintiff that her administrative leave would be a paid one.

43.     In fact, Causey-Drake did not contact Plaintiff regarding the results of Hull House's investigation until September 6, 2007, nearly a week after Hull House's self-imposed deadline.  On that day, Plaintiff received messages from Causey-Drake asking Plaintiff to contact her regarding the issues giving rise to her administrative leave.

**ANSWER:**

Defendants deny that "Causey-Drake did not contact Plaintiff regarding the results of Hull Houses' investigation until September 6, 2007."  Defendant Causey-Drake, further answering, states that in or around August 2007, Causey-Drake attempted to confer with Plaintiff and relate the results of the investigation to Plaintiff.  During that conversation, Plaintiff informed Causey-Drake that Hull House had not interviewed some employees who directly reported to Plaintiff.  Causey-Drake responded by telling Plaintiff that Causey-Drake was unaware that the individual Hull House employees identified by Plaintiff were, in fact, direct reports of Plaintiff.  As a result, Causey-Drake informed Plaintiff that those individuals would be interviewed in order to ensure a complete investigation and that the results of the results of Hull House's investigation would then be related to Plaintiff.  At no time did Causey-Drake or anyone affiliated with Hull House promise or give any assurance to Plaintiff that the investigation would be completed by a date certain.  Defendants admit that Causey-Drake subsequently left a voice message with Plaintiff in or around September 6, 2007 in order to schedule a time to meet with Plaintiff concerning the results of its investigation.

15

44.    On September 10, 2007, Plaintiff called Causey-Drake in follow up to these messages.  Without informing Plaintiff as to what investigation Hull House had done, Causey-Drake told Plaintiff that Hull House had concluded that Plaintiff's employment should be terminated for using "foul language" with her staff members.  Causey-Drake admitted to Plaintiff that Hull House did not know if the allegations against Plaintiff were true.

**ANSWER:**

Defendant Causey-Drake admits that on or about September 10, 2007, Causey-Drake and Plaintiff discussed the results of Hull House's investigation.  Defendants deny that Causey-Drake told Plaintiff "that Hull House had concluded that Plaintiff's employment should be terminated for using 'foul language' with her staff members."  Defendant Causey-Drake denies that Causey-Drake "admitted to Plaintiff that Hull House did not know if the allegations against Plaintiff were true."  Defendant Causey-Drake, further answering, states that Plaintiff was told that as a result of its investigation, Hull House had come to believe that Plaintiff had misused Hull House property (specifically, gift cards intended for the benefit of Hull House clients).  Causey-Drake also informed Plaintiff that because Plaintiff had failed to properly account for these gift cards Hull House was unable to prove actual misuse by Plaintiff, but the appearance of misuse by Plaintiff was apparent and undermined management's confident in Plaintiff.  Defendant Causey-Drake further informed Plaintiff that although Hull House could not prove actual misuse, it was clear that based on the statements of Plaintiff's subordinate managers that Plaintiff had also lost the confidence of her subordinates and that it would be impossible for Plaintiff to continue to manage.  As a result, Plaintiff was given the opportunity to voluntarily resign from her employment in lieu of termination.

45.    Causey-Drake told Plaintiff she could either resign from her position or be fired by Hull House.  Plaintiff refused to resign and denied that Hull House had valid and legitimate grounds upon which to terminate her employment.

**ANSWER:**

Defendants admit that Plaintiff was offered the opportunity to tender a resignation in lieu of termination.  Defendants admit that Plaintiff declined to resign.  Defendants admit that Plaintiff claimed that there was no basis for Plaintiff's termination.

**Termination of Plaintiff's Employment**

46.    On September 28, 2007, Hull House (in a letter signed by Viglione) terminated Plaintiff's employment.  The stated reason for Plaintiff's termination was that she had created "an extremely uncomfortable atmosphere for the staff to complete their work" and therefore acted in a manner "not consistent with the policies and management practices that the Association condones."

**ANSWER:**

Defendants admit the allegations contained in Paragraph No. 46.

47.    The allegations upon which Hull House's termination decision rests are false and, upon information and belief, the Association's stated reason for Plaintiff's termination is a pretext for its unlawful termination of Plaintiff's employment in violation of FMLA.

**ANSWER:**

Defendants deny the allegations contained in Paragraph No. 47.

**COUNT I – VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT OF 1993**
**(Against Hull House)**

48.    Plaintiff adopts and incorporates by reference paragraphs 1 through 47 of this Complaint as if pleaded herein.

**ANSWER:**

Defendant Hull House incorporates its responses to Paragraph Nos. 1 through 47 as and for its response to Paragraph No. 48.

49.    Section 101(4)(A)(i) of FMLA (29 U.S.C. § 2611(4)(A)(i)) defines an "employer" as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."  Hull House is an "employer" under this definition.

**ANSWER:**

Defendant Hull House admits that it is an "employer" as that term is defined under the

Family and Medical Leave Act ("FMLA").

50.     FMLA requires employers to reinstate employees returning from a qualified leave of absence to either "the position of employment held by the employee when the leave commenced" or "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."   29 U.S.C. § 2614(a)(1).   An employer's refusal to reinstate violates § 105(a)(1) of FMLA (29 U.S.C. § 2615(a)(1)).

**ANSWER:**

Defendant Hull House admits the allegations contained in Paragraph No. 50, but denies

that it engaged in any unlawful conduct for which liability can be imposed under the FMLA.

51.     As detailed in paragraphs 34 through 37, *supra*, Plaintiff took a qualified and uncontested FMLA leave of absence from Hull House from July 2, 2007 to August 22, 2007.  As detailed in paragraph 38, *supra*, Plaintiff was medically cleared to, and expressed a desire to, return to work at Hull House effective August 22, 2007.

**ANSWER:**

Defendant Hull House admits the allegations contained in Paragraph No. 51.

52.     Notwithstanding Plaintiff's medical clearance and stated desire to return to work from her FMLA leave, Hull House refused to reinstate Plaintiff to her position as Director of the ILP or place her in an "equivalent" position as that term is defined by 29 C.F.R. § 825.215.

**ANSWER:**

Defendant Hull House denies that "Hull House refused to reinstate Plaintiff to her

position as Director of ILP or place her in an 'equivalent' position.  Defendants, further

answering, admit that Plaintiff continued to hold the position of Director of ILP while she was

placed on paid administrative leave pending the conclusion of Hull House's investigation into

Plaintiff's conduct in that position.

53.     As a direct and proximate result of Defendant Hull House's refusal to reinstate Plaintiff to her position as Director of the ILP or place her in an "equivalent" position following her return from FMLA leave, Plaintiff has suffered various damages including, but not limited to, lost wages and her costs of bringing this suit.

18

**ANSWER:**

Defendant Hull House denies the allegations contained in Paragraph No. 53.

## COUNT II - VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT OF 1993
### (Against Viglione and Causey-Drake)

54.    Plaintiff adopts and incorporates by reference paragraphs 1 through 53 of this Complaint as if pleaded herein.

**ANSWER:**

Defendants Viglione and Causey-Drake incorporate their responses to Paragraphs 1

through 53 as and for their response to Paragraph No. 54.

55.    29 C.F.R. § 825.104 provides that "Employers covered by FMLA also include any person acting, directly or indirectly, in the interest of a covered employer to any of the employees of the employer..."

**ANSWER:**

Defendants Viglione and Causey-Drake admit the allegations contained herein, but deny

that they engaged in any unlawful conduct for which liability can be imposed.

56.    At all times during Plaintiff's employment, Defendants Viglione and Causey-Drake held hiring and supervisory authority over Plaintiff. Defendant Causey-Drake, in communicating Defendant Hull House's intent to terminate Plaintiff's employment, and Defendant Viglione, in signing the letter of termination on behalf of Defendant Hull House, further acted in the interest of a covered employer (Hull House) to its employee (Plaintiff). Thus, each of Defendants Viglione and Causey-Drake is an "employer" under the FMLA.

**ANSWER:**

Defendants Viglione and Causey-Drake deny that they are an "employer" for purposes of

the FMLA.   Defendants further deny that Viglione and/or Causey-Drake engaged in any

unlawful conduct for which liability can be imposed.

57.    As defined employers under FMLA, Defendants Viglione and Causey-Drake also refused to reinstate Plaintiff to her position as Director of the ILP or place her in an "equivalent" position, as detailed in paragraphs 50 to 52, *supra*.

**ANSWER:**

Defendants Viglione and Causey-Drake deny the allegations contained in Paragraph No.

57.

58.     As a direct and proximate result of Defendants Viglione and Causey-Drake's refusal to reinstate Plaintiff to her position as Director of the ILP or place her in an "equivalent" position following her return from FMLA leave, Plaintiff has suffered various damages including, but not limited to, lost wages and her costs of bringing this suit.

**ANSWER:**

Defendants Viglione and Causey-Drake deny the allegations contained in Paragraph No.

58.

## COUNT III - VIOLATION OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT
### (Against Hull House)

59.     Plaintiff adopts and incorporates by reference paragraphs 1 through 58 of this Complaint as if pleaded herein.

**ANSWER:**

Defendant Hull House incorporates its responses to Paragraph Nos. 1 through 58 as and

for their responses to Paragraph No. 59.

60.     Section 5 of IWPCA (820 ILCS 115/5) provides that, "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee."

**ANSWER:**

Defendant Hull House admits the allegations contained in Paragraph No. 60.

61.     Section 2 of IWPCA (820 ILCS 115/2) defines "final compensation" as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties."

**ANSWER:**

Defendant Hull House admits the allegations contained in Paragraph No. 61.

62.     As a regular employee of Hull House, Plaintiff was paid bi-weekly and on the basis of a thirty-five (35) hour workweek. Thus, every two weeks, Plaintiff was paid for seventy (70) hours of work, less mandatory and elective withholdings and deductions.

**ANSWER:**

Defendant Hull House admits the allegations contained in Paragraph No. 62.

63.     As a regular employee of Hull House, Plaintiff also was entitled to accrue 2.91 days (or 20.37 hours) of paid time off ("PTO") per each month of full-time service, for a total of 35 days (or 245 hours) of PTO per year employed (the "PTO bank"). Hull House rules state that if an employee does not use his or her full balance of PTO days in a given employment year, he or she may carry over up to ten (10) PTO days (*i.e.*, 70 PTO hours) to the subsequent employment year. Hull House rules also state that unused PTO in excess of this amount will be credited to an FMLA/Disability time account that the employee may use to receive his or her regular pay during an otherwise qualified, but unpaid, FMLA leave (the "FMLA bank").

**ANSWER:**

Defendant Hull House denies the allegations contained in Paragraph No. 63. Defendant

Hull House, further answering, states that as was explained to all Hull House Association staff in

a July 17, 2006 memorandum, effective January 1, 2007 through December 31, 2007, Hull

House temporarily converted the structure of PTO into vacation, sick time, and personal days.

Defendant Hull House, further answering, states that union employees with three (3) years of

service received thirty-five (35) days, which were broken down to twenty (20) days of vacation,

ten (10) sick days and five (5) personal days. Defendant Hull House, further answering, states

that non-union and management employees with a minimum of two (2) years of service

(including Plaintiff) would receive thirty-five (35) days. Defendant Hull House admits that if an

employee did not use his or her full balance of vacation days in this year that he or she may carry

over up to ten (10) vacation days (70 hours in Plaintiff's case) into the subsequent year. Any

vacation time in excess of 70 hours and any unused portion of the sick and personal time would

be converted into time allotted for FMLA leave. Defendant Hull House, further answering,

states that employees were required to exhaust their vacation, personal and sick days before using FMLA leave.

64.    As of July 2, 2007, when Plaintiff began her approved FMLA leave, Plaintiff had a PTO bank of 147.07 hours and an FMLA bank of 432.38 hours.

**ANSWER:**

Defendant Hull House denies the allegations contained in Paragraph No. 64.  Defendants, further answering, state that effective July 2, 2007, Plaintiff had 42.07 hours of vacation days, 35 hours in personal days, and 70 hours in sick days, which collectively amounted to 147.07 hours. Defendants, further answering, admit that as of July 2, 2007, Plaintiff had 432.38 hours in FMLA leave.

65.    On July 13, 2007, during her approved FMLA leave, Plaintiff was paid $1,980.54 by Hull House, representing her regular bi-weekly salary after certain deductions.  Instead of funding this amount with time from Plaintiff's FMLA bank, Hull House funded it using sixty-three (63) hours drawn from Plaintiffs PTO bank and seven (7) hours of holiday time (for Independence Day).

**ANSWER:**

Defendant Hull House denies the allegations contained in Paragraph No. 65.  Defendant Hull House, further answering, states that the 63 hours were deducted from Plaintiff's allotment of sick time.

66.    On July 27, 2007, during her approved FMLA leave, Plaintiff was paid $1,977.12 by Hull House, representing her regular bi-weekly salary after certain deductions. Instead of funding this amount with time from Plaintiff's FMLA bank, Hull House funded it with seventy (70) hours drawn from Plaintiff's PTO bank.

**ANSWER:**

Defendant Hull House denies the allegations contained in Paragraph No. 66.  Defendant Hull House, further answering, states that Plaintiff's FMLA leave was "funded" with 35 personal hours (which constituted the balance of Plaintiff's personal hours), 28 vacation days and 7 sick

days (which constituted the balance of Plaintiff's sick days), consistent with Hull House's July 17, 2006 memorandum governing the use of vacation, personal and sick days.

67.     On August 10, 2007, during her approved FMLA leave, Plaintiff was paid $1,980.35 by Hull House, representing her regular bi-weekly salary less certain deductions. According to Hull House, instead of funding this amount with time from Plaintiff's FMLA bank, the Association funded it with 24.85 hours drawn from Plaintiff's PTO bank and 45.15 hours drawn from Plaintiff's FMLA bank.

**ANSWER:**

Defendant Hull House denies the allegations contained in Paragraph No. 67.  Defendant Hull House admits that 24.85 hours were deducted from Plaintiff's remaining balance of vacation time.  Defendant Hull House, further answering, states that because the 24.85 deduction had fully exhausted Plaintiff's allotment of vacation time.  As a result, Plaintiff's leave was also "funded" with 45.15 FMLA hours.

68.     On August 24, 2007, the day after Plaintiff was to return from her approved FMLA leave, Plaintiff was paid $1,976.95 by Hull House, representing her regular bi-weekly salary less certain deductions. According to Hull House, this amount was funded with fifty-six (56) hours drawn from Plaintiff's FMLA bank, seven (7) hours of regular pay (in recognition of her attendance at the August 23 meeting) and seven (7) hours of paid administrative leave. The pay stub provided to Plaintiff in connection with this payment, however, indicates that the amount was funded with fifty-six (56) hours drawn from Plaintiff's FMLA bank and fourteen (14) hours drawn from Plaintiff's PTO bank.

**ANSWER:**

Defendant Hull House lacks sufficient knowledge or information to admit the specific allegations contained in Paragraph No. 68 because it does not have a replica of Plaintiff's pay stub for the pay period covering August 24, 2007.  Defendant Hull House, further answering, states that Plaintiff's pay was funded by 56 hours (representing FMLA hours), 7 hours (representing pay for Plaintiff's attendance at Hull House on August 23, 2007), and 7 hours of administrative leave hours.  Defendant Hull House, further answering, denies that any portion of

Plaintiff's pay was funded by Plaintiff's vacation hours because Plaintiff had previously exhausted her allotment of vacation hours.

69.    On September 7, 2007, Plaintiff was paid $1,980.35 by Hull House, representing her regular bi-weekly salary less certain deductions. Hull House funded this amount with seventy (70) hours of paid administrative leave, as per the arrangement promised by Defendant Causey-Drake.

**ANSWER:**

Defendant Hull House admits the allegations contained in Paragraph No. 69.

70.    On September 21, 2007, Plaintiff was paid $1,976.93 by Hull House, representing her regular bi-weekly salary less certain deductions. Instead of funding this amount with seventy (70) hours of paid administrative leave, as per the arrangement promised by Defendant Causey-Drake, Hull House funded it with 45.15 hours drawn from Plaintiff's FMLA bank, 5.39 hours drawn from Plaintiff's PTO bank, and 19.46 hours drawn from an unspecified source.

**ANSWER:**

Defendant Hull House denies the allegations contained in Paragraph No. 70.  Defendant Hull House, further answering, states that the $1,976.93 paid by Hull House to Plaintiff was paid as administrative leave.

71.    On October 5, 2007, Plaintiff was paid $1,127.02 by Hull House, representing one weeks pay (for the period between September 21 and her termination date of September 28) less certain deductions. Hull House funded this amount with thirty-five (35) hours of paid administrative leave, as per the arrangement promised by Defendant Causey-Drake. As of September 28, Plaintiff had an earned, but unused, balance of at least 331.23 hours in her FMLA bank.

**ANSWER:**

Defendant Hull House admits the allegations contained in Paragraph No. 71.

72.    Hull House has refused to pay Plaintiff the monetary equivalent of her FMLA bank within the time frame specified by 820 ILCS 115/5, despite her express request for that payment. Hull House's disclaimer of any obligation to pay the monetary equivalent of those hours to Plaintiff is particularly egregious considering that: (a) as detailed in paragraphs 65 to 67, *supra*, it funded Plaintiff's paid FMLA leave by drawing first from her PTO bank, rather than from the dedicated FMLA bank; and (b) the Association funded, at least in part, Plaintiff's forced administrative leave with time drawn from her PTO and FMLA banks. The foregoing conduct constitutes wilful violations of the IWCPA (820 ILCS 115/14).

**ANSWER:**

Defendant Hull House denies the allegations contained in Paragraph No. 72. Defendant

Hull House, further answering, states that there is nothing contained in the FMLA or the IWPCA

that prevents an employer from requiring an employee such as Plaintiff to exhaust her vacation,

sick and personal time before using her allotment of FMLA leave.

73.    As a direct and proximate result of Hull House's: (a) misuse of Plaintiffs' earned PTO time to fund her FMLA and paid administrative leaves; and (b) refusal to pay Plaintiff the monetary equivalent of her accrued, but unused, FMLA bank following her termination; Plaintiff has suffered various damages including, but not limited to, the amounts unpaid and her costs of bringing this suit.

**ANSWER:**

Defendants deny the allegations contained in Paragraph No. 73.

**COUNT IV - VIOLATION OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT**
**(Against Viglione and Causey-Drake)**

74.    Plaintiff adopts and incorporates by reference paragraphs 1 through 73 of this Complaint as if pleaded herein.

**ANSWER:**

Defendants Viglione and Causey-Drake restate and incorporate their responses to

Paragraph Nos. 1 through 73 as and for their response to Paragraph No. 74.

75.    Section 2 of the IWPCA (820 ILCS 115/2) provides that the term "employer" includes "any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee... " Section 13 of the IWPCA (820 ILCS 115/13) further provides that "Any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation."

**ANSWER:**

Defendants Viglione and Causey-Drake admit the allegations contained in Paragraph No.

75.

76.    At all times during Plaintiff's employment, Defendants Viglione and Causey-Drake held hiring and supervisory authority over Plaintiff, including with respect to her pay; Defendants Causey-Drake and Viglione, in communicating the terms of Plaintiff's

"administrative leave," further acted in the interest of a covered employer (Hull House) to an employee of that employer (Plaintiff). Thus, each of Defendants Viglione and Causey-Drake is an "employer" under the IWPCA.

**ANSWER:**

Defendants Viglione and Causey-Drake deny the allegations contained in Paragraph No.

76.

77.    As defined employers under the IWPCA, Defendants Viglione and Causey-Drake failed to pay Plaintiff the amounts owed her under the IWPCA, as detailed in paragraphs 65 to 72, *supra*.  That conduct constitutes wilful violations of the IWCPA (820 ILCS 115/14).

**ANSWER:**

Defendants Viglione and Causey-Drake deny the allegations contained in Paragraph No.

77.

78.    As a direct and proximate result of Defendants Viglione and Causey-Drake's failures to ensure that: (a) Plaintiffs FMLA and administrative leaves were funded appropriately and; (b) Plaintiff received the amounts owed her under the IWPCA within the time frame specified by the statute, Plaintiff has suffered various damages including, but not limited to, the amounts unpaid and her costs of bringing this suit.

**ANSWER:**

Defendants Viglione and Causey-Drake deny the allegations contained in Paragraph No.

78.

**AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**

In her Complaint, Plaintiff alleges that she has suffered disruption to her personal life, including financial injury, lost benefits, and lost wages.  Plaintiff has an obligation to mitigate her damages.  To the extent that Plaintiff has failed to reduce her damages, Plaintiff's damages should be reduced or barred.

## SECOND AFFIRMATIVE DEFENSE

In her Complaint, Plaintiff alleges that she is entitled to lost benefits and wages due to her discharge. Plaintiff's claim for past, present and future loss of earnings and benefits is subject to a set-off for any interim earnings or benefits acquired by Plaintiff.

## THIRD AFFIRMATIVE DEFENSE

At all times relevant to this action, Defendants believed in good faith that their conduct toward Plaintiff was reasonable and did not violate any provision set forth under Sections 2615(a) through (b) of the Family and Medical Leave Act. Therefore, pursuant to Section 2617(a)(1)(iii) of the FMLA, this Court should not impose liquidated damages against the Defendants.

## FOURTH AFFIRMATIVE DEFENSE

At all times relevant to this action, Defendants Mischelle Causey-Drake and Joyce Viglione, committed no act or omission to act that interfered with Plaintiff's rights under the FMLA, nor constituted retaliation against Plaintiff for exercising her rights under the FMLA. As a result, Defendants Mischelle Causey-Drake and Joyce Viglione are not an "employer" within the meaning of Section 2611(4)(A) of the FMLA. Therefore, Plaintiff cannot bring an action against Defendants Mischelle Causey-Drake or Joyce Viglione under the FMLA.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent that they seek damages beyond the applicable statute of limitations under the IWPCA.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim as to Defendants Mischelle Causey-Drake and/or Joyce

Viglione, as they are not an employer for purposes of the IWPCA.

Dated: March 12, 2008

JANE ADDAMS HULL HOUSE ASSOCIATION, JOYCE VIGLIONE, and MISCHELLE CAUSEY-DRAKE

By:   /s/ Devlin J. Schoop
        One of Their Attorneys

Devlin J. Schoop (06243835)
Laner, Muchin, Dombrow, Becker,
  Levin and Tominberg, Ltd.
515 North State Street
Suite 2800
Chicago, Illinois 60610
(312) 467-9800
(312) 467-9479 (fax)

## CERTIFICATE OF SERVICE

Devlin J. Schoop, an attorney, hereby certifies that he caused the **Answer and Affirmative Defenses to Complaint** to be filed electronically with the Clerk of the United States District Court by operation of the Court's CM/ECF system and a hard copy of same to be delivered to the Chambers of the Honorable Joan B. Gottschall on the 12th day of March, 2008, and to counsel of record by operation of the Court's CM/ECF system to:

> Eric J. Marler
> Scott G. Golinkin
> Keith W. Mandell
> Reardon Golinkin & Reed
> 111 West Washington Street – Suite 707
> Chicago, IL  60602

> /s/ Devlin J. Schoop_____
> Devlin J. Schoop